Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
**PANEL XII**

| JOSÉ COLÓN COTTO Y OTROS<br><br>Apelado<br>v.<br><br>PREFERRED MORTGAGE, CORP. Y OTROS<br><br>Apelante | KLAN202400740 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2021CV01387 (SALÓN 908)<br><br>Sobre: DAÑOS Y OTROS |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Candelaria Rosa, la Jueza Rivera Pérez y la Jueza Díaz Rivera.

Grana Martínez, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de septiembre de 2024.

Los apelantes, José Colón Cotto y otros, solicitan que revoquemos la Sentencia Sumaria Parcial en la que el Tribunal de Primera Instancia desestimó la demanda contra Preferred Mortgage Corp.

La apelada, Preferred Mortgage Corp. presentó su oposición al recurso.

Los hechos pertinentes a la controversia que atendemos hoy son los siguientes.

**I.**

La parte apelante adquirió una propiedad inmueble que necesitaba mejoras, para lo que contrató los servicios de construcción de Floor Plan Corporation. Preferred Mortgage otorgó el préstamo para financiar la compraventa y la construcción. El préstamo fue por la cantidad de $324,936.00; $200,000.00 para el financiamiento y los restantes $124,936.00 para la construcción de las mejoras. El préstamo hipotecario se realizó con garantía de la Administración de Veteranos.

Los apelantes presentaron una demanda contra la constructora, la entidad financiera y su empleado, Eliezer Reyes, en la que alegaron incumplimiento de contrato y reclamaron una indemnización por daños y perjuicios. Algunas de las alegaciones contra la parte apelada son las siguientes:

20. El día del cierre hipotecario, el 20 de marzo de 2018, Preferred, sin haber notificado o informado a los demandantes, emitió un primer cheque a nombre de Floor Plan por la cantidad de $30,752 para materiales, y otro por la cantidad de $6,566 para tramitar los permisos de construcción.

21. Un pago adicional fue llevado a cabo por Preferred a Floor Plan por la cantidad de $21,618.00. Tal pago obedece a la certificación núm. 1. Dicha certificación fue aprobada por el co-demandado Preferred y autorizado por Eliezer Reyes Castro el 12 de junio de 2018.

22. Un pago adicional fue llevado a cabo por Preferred a Floor plan por la cantidad de $21,325.00. Tal pago obedece a la certificación núm. 2. Dicha certificación fue aprobada por el co-demandado Eliezer Reyes Castro en su totalidad el 28 de agosto de 2018.

23. Al momento en que Floor Plan dejó la obra al descubierto, Preferred había pagado certificaciones por la cantidad de $86,827.00.

24. No obstante, Floor Plan en un claro incumplimiento con los Demandantes, no llevó a cabo la totalidad de los trabajos certificados que fueron cobrados, o realizó trabajos deficientes que requieren ser corregidos o nuevamente realizados.

...

26. A pesar de la evidente falta de trabajos o trabajos defectuosos en la Propiedad, Preferred, por medio del co-demandado Eliezer Reyes certificó los mismos y aprobó los pagos a Floor Plan por la cantidad total de $86,827.00. Trabajos que sin ser inspeccionados fueron negligentemente aprobados para pago y pagados por Preferred.

...

29. A pesar de lo anterior, el viernes 2 de noviembre de 2018, el Sr. Edgardo Rovira, abandonó el Proyecto dejando los trabajos inconclusos y deficientes, a pesar de las reclamaciones de los Demandantes.

...

31. Asimismo la Demandante notificó también a Preferred en múltiples ocasiones sobre los

incumplimientos de Floor Plan con los trabajos y sobre el hecho de que negligentemente le fueron aprobadas certificaciones y pagos a pesar de que los trabajos fueron deficientes o no fueron realizados. Preferred en todo momento ha negado responsabilidad en el asunto a pesar de su obvia responsabilidad y negligencia en el asunto.

32. Una vez Floor Plan abandonó el Proyecto solamente quedaba disponible la cantidad de $37,936.00. Dicha cantidad no cubre los trabajos que deben ser reparados y completados a causa de la negligencia e incumplimiento de Floor Plan y Preferred por haber evaluado y aprobado trabajos que estaban deficientes o incompletas.

33. Los demandantes intentaron hacer acercamientos con Preferred, a través de Nery González y Eliezer Reyes a manera de buscar opciones tanto con el contratista como su aseguradora para cumplir con los requerimientos acordados y compensar a los Demandantes por los gastos incurridos y daños.

34. El 7 de junio de 2019, fue llevada a cabo reunión entre los Demandantes, por medio de su anterior representación legal, y funcionarios de la entidad financiera, entre ellos, Nery González y representantes legales de Preferred. En la misma Preferred negó categóricamente cualquier tipo de negligencia en sus actos y se negó a asistir a los Demandantes con el asunto. Preferred únicamente ofreció como alternativa desembolsar el remanente del préstamo de construcción por la cantidad de $37,936.00.

35. A causa de las acciones de Floor Plan y Preferred, al día de hoy, más de tres (3) años de la compra de la Propiedad, los Demandantes aun no pueden disfrutar de la misma, ya que esta no se encuentra en condiciones para ser habitada.

...

41. Las actuaciones de Floor Plan, el Sr. Edgardo Rovira, así como Preferred y el Sr. Eliezer Reyes les hacen responsables de todo daño y gastos incurridos por los Demandantes por los cuales estos responden conjuntamente en su totalidad.

...

45. Como parte de las prestaciones y obligaciones de las partes, Preferred, como entidad financiera y administrador de los fondos de la hipoteca, tiene el deber fiduciario e indelegable de guardar celosamente y asegurarse que los fondos destinados a la construcción y mejoras de la Propiedad de los demandantes sean correctamente desembolsados. Como parte de sus funciones como custodio de los fondos de la Hipoteca y sus obligaciones con los Demandantes, Preferred tenía la obligación de inspeccionar los trabajos realizados por

Floor Plan y únicamente aprobar los pagos por trabajos realizados de manera satisfactoria.

46. Preferred y el Sr. Eliezer Reyes, como funcionario que aprobó las certificaciones de Floor Plan, actuaron negligentemente e incurrieron en un craso incumplimiento de sus obligaciones al desembolsar fondos sin haber inspeccionado los trabajos realizados en la Propiedad, desembolsando la cantidad total de $87,000.00 de los cuales $40,000.00 no procedía su pago.

47. El Sr. Eliezer Reyes responde en su capacidad personal al ser la persona que incumplió con el deber de velar por el buen uso de los dineros separados para la construcción, actuando negligentemente al aprobar certificaciones de trabajos deficientes y no realizados. El Sr. Reyes ni tan [siquiera] visitó la Propiedad para asegurarse que los trabajos estuvieran realizados.

48. No solo ello, sino que Preferred y el Sr. Eliezer Reyes aprobaron las certificaciones entregadas por Floor Plan y pagaron las mismas sin consultar y/o notificar a los Demandantes.

49. Tanto Preferred como el Sr. Eliezer Reyes son responsables y responden por los daños, angustias mentales y pago de cantidades que requiera reparar y terminar la construcción de la Propiedad de manera satisfactoria para que los Demandantes puedan finalmente residir en ella.

Preferred pidió la desestimación sumaria de la reclamación en su contra. La institución financiera adujo que: (1) no responde de la acción de saneamiento porque no es la vendedora, ni la constructora de la obra, (2) no se obligó a garantizar la calidad de los materiales ni de la obra del contratista, (3) cumplió sus funciones como entidad financiera, porque otorgó el préstamo hipotecario solicitado para la compraventa y rehabilitación de la propiedad, (4) los demandantes le relavaron expresamente de responder por los trabajos e incumplimiento del contratista, (5) los demandantes no trajeron al pleito al ingeniero que contrataron para inspeccionar la construcción y supervisar la calidad de los trabajaros, (6) los demandantes asintieron a los pagos que realizó al contratista, porque endosó los cheques expedidos a nombre de ambos.

Por su parte, los apelantes se opusieron a la sentencia sumaria presentada por la apelada y solicitaron sentencia sumaría

a su favor. Los apelantes adujeron que el incumplimiento de la apelada con las obligaciones asumidas en el contrato de préstamo es un hecho probado. Según los apelantes, la entidad financiera permitió desembolsos sin permiso de construcción, por partidas mayores a las certificadas y sin su consentimiento escrito en claro incumplimiento a lo pactado en el contrato de préstamo. La apelada replicó la solicitud de sentencia sumaria de los apelantes.

El TPI dictó sentencia sumaria parcial a favor de Preferred Mortgage Corporation (PMC) y Eliezer Reyes Castro (ERC) y, como consecuencia, desestimó las reclamaciones en su contra. El foro primario determinó los hechos siguientes:

1. El 17 de noviembre de 2017 los demandantes acudieron a las oficinas de Preferred Mortgage Corp. (PMC) y suscribieron varios documentos, incluyendo el contrato de opción de la propiedad sita en la Calle Gardenia Núm. 1720, Urb. San Francisco (en adelante, la "propiedad") y la solicitud de préstamo hipotecario con PMC para la compra de la propiedad.

2. A favor del demandante José Colón Cotto se había expedido un Certificado de Eligibilidad para obtener un préstamo de una institución financiera con garantía de la Administración de Veteranos.

3. Eliezer Reyes Castro (ERC) es un empleado de PMC que se desempeña como originador de préstamos hipotecarios. Posee licencia número 161823 del Nationwide Mortgage Licensing System (NMLS), el sistema federal para el licenciamiento y control de los originadores de préstamos hipotecarios. También posee licencia número 018 de la Oficina del Comisionado de Instituciones Financieras de Puerto Rico como Mortgage Loan Originator.

4. ERC fue el empleado de PMC que el 17 de noviembre de 2017 originó y orientó a los demandantes respecto al préstamo hipotecario para la compra y reparaciones de la propiedad, con garantía de la Administración de Veteranos. Ese día los demandantes firmaron varios documentos como parte del proceso de originación del referido préstamo.

5. Entre los documentos firmados por los demandantes el 17 de noviembre de 2017 se encuentran los siguientes:
a) Autorización / Autorization
b) HUD/VA Addendum to Uniform Residential Application
c) Interviewer's and Applicant's Certification
d) Certificación

e) ¡¡¡Atención!!! Conozca sus derechos
f) Counseling Checklist for Military Homebuyers
g) Requisitos Generales – Préstamo con reparaciones

6. Luego de originarse la solicitud del préstamo hipotecario, el 2 de febrero de 2018 los demandantes firmaron, en español e inglés, el documento titulado Requisit[i]os Generales – Préstamo con reparaciones VA, así como su versión en inglés. En el referido documento se establece, en lo pertinente, que:

"Acuerdos y negociaciones con el contratista son realizados por el cliente, no por nosotros Banco."

"Las garantías de construcción y mejoras son con el contratista... NO con el Banco."

"Cliente tiene que entregar carta certificando que esté de acuerdo con todas las reparaciones realizadas para recibir su cheque de reembolso."

"El contratista se compromete a no hacer reclamación alguna contra el banco si el cliente no acepta pagar por mejoras incompletas o no aceptadas por el cliente."

"*NO HAY ADELANTO...SOLO REEMBOLSO."[1]

"El cheque es a nombre del cliente y del contratista."

"CLIENTE TIENE QUE TENER DINERO PARA REALIZAR LAS MEJORAS QUE INDICA LA TASACION."

7. El 20 de marzo de 2018 los demandantes llevaron a cabo la compraventa de la propiedad ubicada en la Calle Gardenia Núm. 1720, Urb. San Francisco mediante la Escritura Núm. 6 sobre compraventa del 20 de marzo de 2018 ante el Notario Nicole M. Cobb Vélez. El precio de la compraventa de la propiedad fue por la cantidad acordada de $200,000.00.

8. El 20 de marzo de 2018 los demandantes también obtuvieron el préstamo hipotecario núm. 17-8173 (VA #55-55-06-0130365) a 30 años con PMC y firmaron la correspondiente escritura de hipoteca, Escritura Núm. 149 ante la Notario Lesbia Hernández Miranda.

9. Esta compraventa, que incluye reparaciones y mejoras a la propiedad, fue financiada por un préstamo hipotecario bajo los parámetros del Departamento de Asuntos del Veterano.

---

[1] Véase, pág. 1134 del apéndice del recurso.

10. El préstamo hipotecario fue por la cantidad total de $324,936.00, desglosados en la cantidad de $200,000.00 para el financiamiento de la compraventa de la propiedad y la cantidad de $124,936.00 para la obra de construcción de las reparaciones y mejoras a ser llevadas a cabo en la propiedad.

11. Luego de la compraventa quedó en una cuenta de plica ("escrow account") un balance de $124,936.00, destinados para financiar las mejoras a la propiedad.

12. Ese 20 de marzo de 2018, durante el cierre, los demandantes firmaron varios documentos, como parte del proceso de otorgamiento del referido préstamo.

13. Entre los documentos firmados por los demandantes el 20 de marzo de 2018 se encuentran los siguientes:

a) Certificaciones
b) Certifications
c) Reconocimiento de Responsabilidad Absoluta y Relevo de Responsabilidad para Preferred Mortgage Corp. en Contratación de Contratista para Obras a Realizarse
d) Absolute Liability Recognition and Release of Liability for Preferred Mortgage Corp. in Hiring Contractors for works to be Done
e) Declaración de los compradores demandantes
f) Certificación de Haber Recibido Orientación Adecuada, Reconocimiento y Relevo de Responsabilidad
g) Acuerdo de Realizar Reparaciones Requeridas por Reglamentación y Política de la Agencia Correspondiente
h) Agreement to Carry Out Repairs Required By Rules and Policy of the Corresponding Agency
i) Acuerdo de Realizar Reparaciones Requeridas por Reglamentación y Política de la Agencia Correspondiente
j) Agreement to Carry Out Repairs Required By Rules and Policy of the Corresponding Agency
k) Para Tu Protección Haz Una Inspección

14. El 20 de marzo de 2018 los demandantes firmaron, en sus versiones en español e inglés, el documento titulado: Reconocimiento de Responsabilidad Absoluta y Relevo de Responsabilidad para Preferred Mortgage Corp. en Contratación de Contratista para Obras a Realizarse, así como su versión en inglés.

15. El referido documento reza textualmente:

"Reconocimiento de Responsabilidad
Absoluta y Relevo de Responsabilidad
para Preferred Mortgage Corp. en

### Contratación de Contratista para Obras a Realizarse

Por la presente, reconocemos que hemos sido orientados por el personal de Preferred Mortgage Corp. en cuanto a la contratación de contratista para realizar la obra de mejoras y/o reparaciones en la propiedad localizada en:

1720(1-12) Gardenia St. San Francisco, San Juan, PR 00927

Nosotros somos los actuales dueños o estamos en el trámite de adquirir dicha propiedad mediante financiamiento provisto por Preferred Mortgage Corp. El personal de dicha empresa nos ha orientado con relación a lo siguiente:

1. Preferred Mortgage Corp. no recomienda ni tiene relación comercial con contratista alguno que pueda ser contratado por nosotros para realizar las obras de mejoras y/o reparaciones a la propiedad antes descrita.

2. Preferred Mortgage Corp. de tiempo en tiempo, a través de cualquiera de sus empleados, pueda proveer una lista de nombres de contratistas que en el pasado han sido contratados por otros clientes en las mismas circunstancias, o con las mismas necesidades, pero entendemos que esto no constituye una recomendación por parte de ellos.

3. Que nosotros somos los responsables absolutos de verificar las referencias y reclamaciones existentes de cualquier contratista que contratamos.

4. Que existen mecanismos para realizar estas verificaciones, tales y como DACO, etc.

5. Que de tener cualquier disputa o problema con el contratista que contratamos, entendemos que nuestra reclamación es contra el mismo, no contra Preferred Mortgage Corp. y que Preferred Mortgage Corp. no tiene responsabilidad ninguna con relación al incumplimiento por parte del contratista.

Por lo cual, hacemos las siguientes certificaciones y representaciones:

1. Asumimos completa y absoluta responsabilidad por la contratación del contratista que realizará las obras de mejoras y/o reparaciones de la propiedad antes descrita.

2. Relevamos a Preferred Mortgage Corp. de toda responsabilidad con relación a cualquier posible reclamación que podamos tener por incumplimiento por parte del contratista.

3. Nos comprometemos a no radicar reclamación alguna contra Preferred Mortgage Corp. en cualquier foro, incluyendo pero no limitado a DACO, OCIF, o cualquier Tribunal estatal o federal, o cualquier otro que puede tener inherencias o jurisdicción en el asunto.

4. Nos comprometemos a defender a Preferred Mortgage Corp. contra cualquier reclamación que pueda surgir con relación al préstamo que nos otorgara y los desembolsos subsiguientes, incluyendo el pago de todo gasto o costa incurrido por ellos en su propia defensa.

Hacemos estas certificaciones y representaciones voluntariamente y libremente sin que medie coacción alguna."

16. El documento Acuerdo de Realizar Reparaciones Requeridas por Reglamentación y Política de la Agencia Correspondiente suscrito -en español e inglés por los demandantes el 20 de marzo de 2018 establece que:

"Los suscribientes reconocen y aceptan que con el propósito de llevar a cabo el cierre no habiendo cumplido con las reparaciones requeridas por el tasador, autorizan a Preferred Mortgage Corp., a retener la cantidad de $124,936.00 para asegurar dichas reparaciones. Los suscribientes se comprometen solidariamente realizar las reparaciones de manera satisfactoria... Los suscribientes dan fe de todo lo anterior y reconocen que sus responsabilidades bajo este acuerdo son de manera solidaria. Los suscribientes relevan a Preferred Mortgage Corp. de cualquier responsabilidad por cualquier daño o defecto que pueda surgir como resultado de la intervención de ésta."

17. De igual manera, los demandantes firmaron el documento titulado: PARA TU PROTECCION HAZ UNA INSPECCION, que les orienta sobre su derecho a contratar un inspector calificado independiente para evaluar la condición física, estructura, construcción y sistema mecánicos de la propiedad, así como identificar las cosas que deben ser reparadas o reemplazadas. Establece claramente que: "Tienes el derecho de examinar cuidadosamente la unidad que vas a comprar con un inspector calificado."

18. Es responsabilidad de los clientes o compradores contratar o estar asistido por un inspector, evaluador o asesor que revise el avance y la calidad de los materiales y de los trabajos de

remodelación realizados por el contratista seleccionado por los clientes y compradores. Así les fue advertido en múltiples ocasiones durante el procesamiento del préstamo.

19. Los trabajos de construcción en la propiedad fueron contratados por los demandantes con el co-demandado Floor Plan Corp., por medio de su dueño, Sr. Edgardo Rovira.

20. Los demandantes buscaron, evaluaron, escogieron, negociaron, aprobaron y aceptaron la cotización y propuesta del contratista, y contrataron directamente con él para realizar las alteraciones, reparaciones y obras de mejoras en su propiedad.

21. Omar Morales O´Neill, esposo de Mónica Colón Vidal, hija de los demandantes, fue quien buscó a Floor Plan Corp. y Edgardo Rovira, a quien conocía previamente, para hacer las reparaciones y remodelación de la propiedad.

22. Floor Plan Corp. y Edgardo J. Rovira ("el contratista") presentaron una cotización, propuesta fechada 12 de febrero de 2018, para realizar las alteraciones, reparaciones y obras de mejoras en la propiedad, por el total de construcción de $124,936.00. La misma fue aceptada y firmada por los demandantes.

23. Los codemandados PMC y ERC no firmaron la propuesta del contratista, Floor Plan Corp. y Edgardo J. Rovira, para realizar las alteraciones, reparaciones y obras de mejoras en la propiedad, es decir, el acuerdo entre los demandantes y el contratista del 12 de febrero de 2018.

24. Todos los desembolsos y cheques relacionados con el contratista y las reparaciones y obras de mejoras a la propiedad fueron emitidos a nombre de José Colón, Elsa Vidal y Floor Plan Corp.

25. El 20 de marzo de 2018, en el acto del cierre del préstamo hipotecario, se entregaron a los demandantes los cheques números 135908 por la suma de $6,566.00 como adelanto para el permiso de construcción y 135909 por la suma de $30,752.00 como adelanto de reparaciones (materiales). Tales adelantos fueron consultados a los demandantes y aceptados antes del día del cierre.

26. Ambos cheques números 135908 por la suma de $6,566.00 como adelanto para el permiso de construcción y 135909 por la suma de $30,752.00 como adelanto de reparaciones (materiales) se expidieron a favor de José Colón, Elsa Vidal y Floor Plan Corp. Ambos cheques fueron entregados a, y recibidos por, los demandantes el 20 de marzo de 2018, quienes los endosaron y entregaron al contratista.

27. Luego de su originación y cierre, el préstamo y la hipoteca fueron adquiridos por Banco Popular de

Puerto Rico (BPPR), el cual asumió la administración del préstamo y del balance del dinero retenido para las obras de construcción; y el 26 de marzo de 2018 le fue remitido un cheque por la suma de $87,618.00 (balance del dinero retenido para las obras de reparaciones y remodelación en cuenta de plica ("escrow account").

28. El 6 de abril de 2018, el Departamento de Asuntos del Veterano expidió el certificado de garantía del préstamo hipotecario por la suma de $324,936.00.

29. El 28 de abril de 2018 la demandante Elsa I. Vidal González firmó una autorización al Ingeniero Guillermo Burgos para realizar los trámites necesarios a la obtención y aprobación de los permisos y endosos concernientes al proyecto en la Urb. San Francisco, Calle Daniela, San Juan, PR.

30. El 30 de abril de 2018 el demandante José Colón Cotto y el Ing. Guillermo Burgos firmaron el Contrato de Designación Aceptación del Supervisor o Inspector de Obras. En el mismo, se designó al Ing. Guillermo Burgos como supervisor o inspector de obras en la construcción o desarrollo del proyecto ubicado en la Calle Diamela esquina Gardenia #1720, Urb. San Francisco, San Juan.

31. El referido Contrato de Designación Aceptación el Supervisor o Inspector de Obras, firmado por el demandante José Colón Cotto y el Ing. Guillermo Burgos, en lo pertinente establece que:

"CONTRATO DE DESIGNACIÓN
ACEPTACIÓN DEL SUPERVISOR O INSPECTOR
DE OBRAS
...

2. El dueño del proyecto deberá:

a. hacer las gestiones que sean necesarias para que el inspector que él designe, conozca y coordine sus responsabilidades con el contratista o constructor.

b. asegurarse y exigir del contratista de la obra, que notifique al inspector la fecha de comienzo de la obra.

c. asegurarse que sea presentado cualquier plano enmendado y/o documento que la Oficina de Permisos requiera para la aprobación final del caso.

....

4. El inspector de obra tiene, entre otras:

a. la responsabilidad de preparar por lo menos un informe mensual de las inspecciones periódicas realizadas del cual entregará copia:

1) al dueño del proyecto

2) a la Oficina de Permisos para ser incluida en el expediente de la obra. b. la responsabilidad de mantener copia de los informes mensuales en un expediente que estará disponible en la obra para examen por cualquier funcionario público debidamente autorizado. Cada informe contendrá observaciones y comentarios sobre el progreso de la obra de acuerdo con la labor ejecutada por la etapa cubierta por éste y sobre cualquier otro detalle o información que el inspector estime pertinente.

c. notificar por escrito a la Oficina de Permisos cuando el convenio o contrato entre el dueño de la obra y el inspector quede sin efecto, relevando de sus labores o funciones al inspector. Además, indicará la etapa en que estaba la obra al momento de la terminación de sus funciones. Certificará la parte de la obra por él inspeccionada.

5. Una vez recibidas las certificaciones requeridas del inspector y del contratista a la terminación de las obras de construcción, ampliación, reconstrucción o modificación, en todo o en parte, el dueño vendrá obligado a requerir la expedición del permiso de uso a la Oficina de Permisos (OP) para ocupar o usar dicha propiedad.

6. Ambas partes vienen obligadas a informar cualquier cambio en el costo de la obra a la Oficina de Permisos.

7. Cualquiera de las partes podrá rescindir el presente contrato mediante notificación escrita con treinta (30) días de anticipación y previa notificación a la Oficina de Permisos."

32. Los demandantes nunca informaron a PMC que el Ing. Guillermo Burgos fue contratado como el inspector de las obras de reparación, remodelación y mejoras de su propiedad en la Calle Daniela, Urb. San Francisco.

33. El Ing. Guillermo Burgos nunca se comunicó con PMC.

34. El Ing. Guillermo Burgos preparó y sometió al Municipio de San Juan, entre otros documentos la Solicitud del permiso de construcción, un Memorial Explicativo, un desglose completo de costos de las obras o mejoras a la propiedad sita en la Calle Damiela Núm. 1720, Urb. San Francisco, San Juan y las especificaciones técnicas del proyecto que se estaría realizando y que él estaría supervisando; además de una certificación como ingeniero proyectista de la obra ante la Oficina de Gerencia y Permisos. Los referidos documentos nunca fueron informados ni entregados a PMC.

35. El 25 de mayo de 2018 se expidió el permiso de construcción del Municipio de San Juan para mejoras a la propiedad sita en la Calle Damiela Núm. 1720, Urb. San Francisco, San Juan.

36. El 13 de junio de 2018, se emitió el cheque número xx771280 del BPPR por la suma de $6,566.00 como balance del permiso de construcción a nombre de José Colón, Elsa Vidal y Floor Plan Corp.

37. La parte demandante y el contratista recibieron el 25 de junio de 2018 el cheque número xx771280 del BPPR por la suma de $6,566.00 como balance del permiso de construcción.

38. Los demandantes firmaron y entregaron al contratista el cheque número xx771280 del BPPR por la suma de $6,566.00 como balance del permiso de construcción.

39. El Ing. Guillermo Burgos nunca rindió un informe sobre las obras de construcción, reparación, remodelación y mejoras de la propiedad sita en la Calle Daniela Núm 1720, Urb. San Francisco.

40. ERC, como empleado de PMC, colaboró para visitar la propiedad en varias ocasiones, a solicitud de la institución bancaria, para evaluar con grado de razonabilidad que lo que alegaba el contratista que había realizado se podía observar en la obra; es decir, si los desembolsos solicitados por el cliente y el contratista estaban fundados en lo que se podía percibir ocularmente del progreso de la obra.

41. Una vez se recibe el informe de lo observado por ERC, el BPPR procedía a preparar cheque, a nombre de los clientes y del contratista, de manera solidaria, para asegurar que el mismo fuera aceptado, firmado y endosado por los compradores y por el contratista, y con el aval de todos los firmantes acreditar la satisfacción con los trabajos realizados. Los demandantes, clientes o compradores podían negarse a firmar el cheque y negarse a entregarlo al contratista, si estaban insatisfechos con los trabajos realizados y la calidad de los mismos e incluso, en el documento titulado Requisitos Generales – Préstamo con reparaciones VA pactaron que el contratista "se compromete a no hacer reclamación alguna contra el banco si el cliente no acepta pagar por mejoras incompletas o no aceptadas por el cliente."

42. ERC no tenía a su cargo o bajo su responsabilidad hacer una determinación de la calidad de la labor realizada, ni la calidad o cantidad de materiales de la obra; nunca fue inspector de las obras ni supervisor de las remodelaciones que se llevarían a cabo en la propiedad, ni de la calidad de los materiales o la calidad del trabajo del contratista.

43. El 6 de junio de 2018 el contratista, Floor Plan Corp. y Edgardo Rovira, remitió una factura a nombre

de los demandantes José Colón Cotto y Elsa Vidal. (Certificación 1)

44. El 12 de junio de 2018 ERC visitó la propiedad y observó el progreso de la obra. Ese mismo día preparó un "Memo to File" en torno a la primera fase de las obras.

45. El desembolso de la primera etapa o fase fue realizado a nombre de la parte demandante José Colón, Elsa Vidal y del contratista Floor Plan Corp., por la suma de $21,618.00, mediante cheque del BPPR, número 05002-0000775946 fechado 26 de junio de 2018.

46. Los demandantes José Colón y Elsa I. Vidal suscribieron una comunicación en manuscrito el 10 de julio de 2018 en el cual indican: "autorizamos a nuestra hija Mónica M. Colón a recoger los cheques junto con el Sr. Rovira (contratista)…"

47. El 16 de julio de 2018 la parte demandante -por conducto de su hija Mónica M. Colón- recogió y recibió el pago, junto al contratista, por la suma de $21,618.00, mediante cheque del BPPR, número 05002-0000775946 fechado 26 de junio de 2018.

48. La parte demandante recibió el pago por la suma de $21,618.00 mediante cheque, que firmó, endosó y lo entregó al contratista.

49. La Sra. Elsa I. Vidal González endosó y firmó por sí y por su esposo, José Colón Cotto, el cheque por la suma de $21,618.00 y luego se lo entregó al contratista.

50. El 20 de agosto de 2018 Floor Plan Corp. y Edgardo Rovira remitieron una segunda factura a nombre de los demandantes José Colón Cotto y Elsa Vidal. (Certificación 2)

51. El 28 de agosto de 2018 Eliezer Reyes Castro visitó la propiedad y observó el progreso de la obra. Ese mismo día preparó un "Memo to File" de las obras.

52. El desembolso de la segunda etapa o fase fue realizado a nombre del demandante José Colón, Elsa Vidal y del contratista Floor Plan Corp., por la suma de $21,325.00, mediante cheque del BPPR, número 05002-0000791766 fechado 5 de septiembre de 2018.

53. El 14 de septiembre de 2018 la parte demandante recogió y recibió -por conducto de su hija Mónica M. Colón- junto al contratista, el pago por la suma de $21,325.00, mediante cheque del BPPR, número 05002-0000791766 fechado 5 de septiembre de 2018.

54. La parte demandante recibió el pago por la suma de $21,325.00, mediante cheque, que firmó, endosó y entregó al contratista.

55. La Sra. Elsa I. Vidal González también endosó y firmó por sí y por su esposo, José Colón Cotto, el cheque por la suma de $21,325.00 y luego se lo entregó al contratista.

56. A tenor con el contrato firmado entre la parte demandante y PMC, se emitieron los cheques a nombre de la parte demandante y del contratista; la parte demandante recibió estos pagos, los firmó, y le pagó al contratista.

57. Los siguientes cheques fueron emitidos a favor de José Colón, Elsa Vidal y Floor Plan Corp.:

a. Número 135909 de 20 de marzo de 2018 por la cantidad de $30,752.00;
b. Número 135908 de 20 de marzo de 2018 por la cantidad de $6,566.00;
c. Número xx771280 de 13 de junio de 2018 por la cantidad de $6,566.00;
d. Número xx775946 de 13 de junio de 2018 por la cantidad de $21,618.00;
e. Número xx791766 de 5 de sept. de 2018 por la cantidad de $21,325.00.

El total de desembolsos por concepto de adelanto de materiales, permisos de construcción y reembolsos por reparaciones asciende a $86,827.00. El balance pendiente del préstamo de mejoras a la propiedad suma $38,109.00, luego de descontados tales pagos.

58. Los demandantes recogieron, recibieron, aceptaron y firmaron cada cheque y pago emitido, de los reseñados en el párrafo que antecede, y los entregaron al contratista, sin haber comunicado objeción o queja alguna a PMC.

59. Los demandantes apenas visitaron la propiedad una o dos veces mientras se llevaban a cabo las reparaciones o remodelaciones de la misma.

60. Luego del desembolso del cheque por la suma de $21,325.00, PMC no emitió desembolso, pago o cheque adicional alguno a favor de la parte demandante y del contratista.

61. El 3 de octubre de 2018 el contratista Floor Plan Corp. y Edgardo Rovira remitieron una tercera factura a nombre de los demandantes José Colón Cotto y Elsa Vidal, para el periodo de trabajo del 20 de agosto al 3 de octubre de 2018. (Certificación 3)

62. El 16 de octubre de 2018, conforme surge del expediente de PMC, se registró una llamada de la Sra. Mónica Colón, hija de los codemandantes José Colón y Elsa Vidal, en la que se le manifiesta a PMC que "las reparaciones iban muy lentas"; además en dicha anotación se indica que se coordinará una visita con el Sr. Eliezer Reyes.

63. El 19 de octubre de 2018 ERC visitó la propiedad y observó el progreso de la obra. Ese mismo día preparó dos (2) "Memo to File" en torno a la tercera fase de las obras.

64. El codemandado ERC acreditó el 19 de octubre de 2018 que no hubo progreso sustancial en la obra por parte del contratista –"there was no substantial progress to recommend the requested disbursement", por lo cual no se libró pago al contratista en lo sucesivo, incluyendo el pago de la factura del 3 de octubre de 2018 (2018-009) por la suma de $19,457.50.

65. El 26 de octubre de 2018, el Sr. Edgardo Rovira, entre otros asuntos, notificó "la cancelación de los trabajos durante este fin de semana (26-28 oct.), debido a la no aprobación para pago de la factura 2018-009 ($19,457.50)".

66. Mediante correo electrónico del 1 de noviembre de 2018, el contratista notificó a los demandantes que "la obra será detenida...".

67. El 9 de noviembre de 2018 por primera vez los demandantes, remitieron al contratista una comunicación escrita fechada 6 de noviembre de 2018 y le reclamaron por su incumplimiento contractual, así como materiales y labores realizadas, vicios ocultos de las obras de remodelación y de las mejoras a la propiedad.

El foro apelado exoneró a PMC de responsabilidad por la reclamación de vicios de construcción conocida como acción decenal. Según el TPI, la responsabilidad decenal por los vicios de construcción del contratista y del arquitecto no se extiende a la entidad financiera, cuando no ha participado en la construcción, ni en la venta del inmueble y se ha ceñido a su función usual como entidad bancaria. El foro apelado quedó convencido de que la participación de PMC se circunscribió al financiamiento de la compraventa y de las obras de construcción.

El TPI determinó conforme a la prueba presentada que: (1) los apelantes solicitaron a PMC un préstamo hipotecario con garantía de la Administración de Veteranos para la compra y rehabilitación de la propiedad en controversia, (2) PMC evaluó su escenario financiero y determinó la cantidad que podía prestarles, el interés aplicable y los años que duraría el préstamo con garantía

hipotecaria, (3) El 20 de marzo de 2018 ambas partes firmaron un contrato de financiamiento y préstamo hipotecario para la compra y remodelación de la propiedad y (4) PMC y ERC no se obligaron con los apelantes a garantizar la calidad de la obra de los materiales utilizados, ni a responder por los actos de los contratistas. Fue enfático en que PMC inspeccionó la obra únicamente para asegurarse de que las etapas se realizaron, antes de hacer el desembolso. La prueba documental convenció al TPI de que los apelantes asumieron las consecuencias de sus actos. El TPI hizo hincapié en que la parte apelante firmó los cheques desembolsados a su nombre y se los entregó al contratista de forma libre y voluntaria, a pesar de que tenía la facultad de retenerlos. El foro apelado resolvió que los apelantes no podían responsabilizar a la entidad financiera, porque fueron ellos quienes pagaron los adelantos de permiso y de material. El TPI insistió en que los apelantes endosaron los cheques y los entregaron al contratista, sin ninguna objeción, ni alegación alguna de inconformidad con lo construido o dejado de construir.

Al TPI le resultó contradictorio que los dueños de la obra asintieran a pagar las etapas de la construcción y a endosar los cheques a Floor Plan, sin asegurarse de que las obras se realizaron correctamente y a pesar de que contrataron los servicios del ingeniero Guillermo Burgos para que revisara el trabajo del contratista.

El foro primario exoneró a PMC de responsabilidad por las alegaciones de incumplimiento de contrato. El TPI concluyó que la entidad financiera cumplió con los acuerdos suscritos en el contrato de préstamo que otorgó con los apelantes. Según el TPI, no existe controversia de que: (1) los contratantes acordaron expresamente que los pagos de reembolsos se realizarían mediante cheques a nombre de los demandantes y del contratista, (2) PMC le entregó los

cheques a la parte apelante, (3) los apelantes firmaron y entregaron los cheques al contratista, (4) los apelantes podían no recibirlos, no firmarlos, no endosarlos y no entregarlos al contratista.

El TPI advirtió que la apelante contrató los servicios del ingeniero Guillermo Burgos como supervisor o inspector de las obras y que PMC no tuvo intervención alguna en ese contrato. Según el TPI, Burgos se comprometió a: (1) preparar por lo menos un informe mensual de las inspecciones periódicas realizadas, (2) entregar copia de ese informe al dueño del permiso y a la Oficina de Permisos, (3) hacer constar en cada informe las observaciones y comentarios del progreso de la obra de acuerdo con la labor ejecutada por la etapa cubierta y (4) hacer constar cualquier otro detalle o información que el inspector determine pertinente. Sin embargo, (1) los apelantes nunca informaron a PMC que el ingeniero Guillermo Burgos iba a supervisar e inspeccionar la obra, ni le presentaron ningún documento sobre sus responsabilidades y (2) el ingeniero Burgos no rindió ningún informe sobre las obras. Al TPI no le pareció correcto responsabilizar vicariamente a PMC por las actuaciones del ingeniero Burgos. No obstante, advirtió que el ingeniero Burgos podía responderles a los apelantes, ya que fueron quienes contrataron sus servicios.

El foro apelado eximió de responsabilidad al señor Reyes, por ser el empleado de PMC que originó y orientó a los apelantes respecto al préstamo. El TPI quedó convencido de que entre Reyes y los apelantes no existía ningún vínculo ni obligación contractual que lo obligara a certificar la calidad de la obra y de los materiales usados y de su idoneidad. Según el TPI, el señor Reyes visitó la propiedad a solicitud de la institución bancaria, para evaluar si el contratista realizó la obra correspondiente a una etapa determinada. No obstante, concluyó que sus visitas no eran para asegurarse de la calidad de los trabajos y de materiales. El TPI enfatizó que Reyes se

limitó a visitar la propiedad y constatar visualmente que el contratista completó la etapa, para hacer los pagos parciales a su nombre y de la apelante, según lo convenido.

El foro primario advirtió que orientó a la apelante sobre la conveniencia de contratar su propio inspector para que velara por la calidad de la obra y de los materiales usados. El tribunal hizo constar que la apelante contrató los servicios del ingeniero Burgos y que este no ha presentado ningún informe sobre las obras realizadas por el contratista.

El TPI exoneró a los apelantes de responsabilidad a base de los hechos que determinó probados y de su interpretación de los acuerdos entre las partes. Al TPI le pareció forzoso concluir que los apelantes pactaron expresamente y en términos diáfanos e inequívocos el relevo total de responsabilidad de la apelada y de su empleado, cuando acordaron: (1) que las garantías de construcción y mejoras eran del contratista, (2) cualquier disputa o problema con el contratista era contra este y no contra la apelada, (3) que la apelada estaría exonerada de total responsabilidad por el incumplimiento del contratista, (4) asumir completa y absoluta responsabilidad por la contratación del contratista y relevaron a la apelada de responsabilidad por cualquier reclamación de incumplimiento del contratista, (5) no radicar ninguna reclamación contra la apelada en ningún foro y defenderla contra cualquier reclamación relacionada al préstamo, (6) lograr que la casa cumpliese los requisitos de financiamiento acordado y (7) relevar a PMC de cualquier responsabilidad.

El 21 de junio de 2024, el TPI dictó la Sentencia Parcial apelada en la que desestimó la demanda contra Preferred Mortgage Corp. y Eliezer Reyes Castro. Los apelantes presentaron una moción de reconsideración. El TPI denegó la moción de reconsideración.

Inconforme, la parte apelante presentó este recurso en el que alega que:

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DESESTIMAR LA DEMANDA POR LA VÍA DE SENTENCIA SUMARIA SIN RESOLVER LA CONTROVERSIA DEBIDAMENTE PLANTEADA Y NO REFUTADA EN TORNO AL INCUMPLIMIENTO DE CONTRATO DE PMC DE SU OBLIGACIÓN CON LOS REQUISITOS GENERALES DEL PRÉSTAMO Y LAS REGLAS FEDERALES DE LA ADMINISTRACIÓN DE VETERANOS EN EL CAPÍTULO 7 DEL "VA LENDERS HAND BOOK" EN SU VERSIÓN TANTO DE NOVIEMBRE DE 2012 Y REVISADO EN MARZO DE 2019 QUE LE OBLIGABA A, ANTES DE EMITIR CHEQUES PARA DESEMBOLSAR FONDOS DEL PRÉSTAMO, REQUERIR CARTA ESCRITA DEL DUEÑO SOLICITANDO EL DESEMBOLSO DE LOS FONDOS DE LA OBRA APROBANDO LAS CERTIFICACIONES Y FACTURAS DEL CONTRATISTA, CONTRARIO A LO RESUELTO POR EL TRIBUNAL SUPREMO EN <u>CRUZ</u> V. <u>CASA BELLA CORP.</u>, 2024 TSPR 47(2024).

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NO RESOLVER EL PLANTEAMIENTO DE CRASA NEGLIGENCIA DE PMC AL CAMBIAR UNILATERALMENTE LAS CONDICIONES Y LA NATURALEZA DEL CONTRATO DEL PRÉSTAMO SIENDO UNO DE REEMBOLSOS Y CONCEDER UN ADELANTO TOTAL DEL 30 POR CIENTO DE PRESUPUESTO DE LA OBRA, MEDIANDO ABUSO DE DISCRESIÓN AL ADOPTAR UNA INTERPRETACIÓN COMPLETAMENTE CONTRARIA A LO DISPUESTO EXPRESAMENTE EN LA LETRA DEL CONTRATO Y LA REGULACIÓN FEDERAL, BASADO EN MERAS ALEGACIONES DE LOS EMPLEADOS DE PMC INVOCANDO EL "USO Y COSTUMBRE" EN PUERTO RICO, DEJANDO A LOS CLIENTES DESPROTEGIDOS ANTE LA FIGURA DEL CONTRATISTA, Y A SU VEZ CONTRADICIENDO LO RESUELTO EN <u>CRUZ</u> V. <u>CASA BELLA CORP.</u>, 2024 TSPR 47 (2024), A PESAR DE HABER HECHO REFERENCIA A ESTA JURISPRUDENCIA EN SU SENTENCIA.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NO ATENDER LOS PLANTEAMIENTOS DE NEGLIGENCIA CRASA POR PARTE DEL BANCO EN SU ROL DE ADMINISTRADOR DE FONDOS AL HABER AUTORIZADO Y EMITIDO CHEQUES POR LA TOTALIDAD DE PARTIDAS DE PERMISO DE CONSTRUCCIÓN POR $13,132 CUANDO SE LE PRESENTÓ UN PERMISO DE $22,822.80 PARA UNA OBRA DE $124,936 Y NO REQUERIR EVIDENCIA ACREDITATIVA DE LAS PARTIDAS DE MATERIALES ADELANTADAS, PERPETRANDO FRAUDE Y MAL MANEJO DE FONDOS CON GARANTÍA FEDERAL.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NO DETERMINAR QUE EL BANCO REBASÓ SUS FUNCIONES COMO ENTIDAD

FINANCIERA AL AUTORIZAR QUE EL CONTRATISTA COBRARA DE LOS FONDOS DEL PRÉSTAMO UNA PARTIDA POR EL ALEGADO "PROJECT MANAGER" O INSPECTOR DE OBRAS, CUANDO A SU VEZ HIZO DETERMINACIONES SOBRE QUE EL INSPECTOR DE OBRAS DEBÍA SER UNA FIGURA INDEPENDIENTE PARA FISCALIZAR EL TRABAJO DEL CONTRATISTA Y CUANDO DE LA PRUEBA DEL PROPIO APELADO SURGE QUE TODAS LAS COMUNICACIONES PARA LAS SOLICITUDES DE DESEMBOLSOS Y ENTREGA CERTIFICACIONES, PERMISOS Y FACTURAS FUERON EN TODO MOMENTO DIRECTAMENTE ENTRE EL BANCO Y EL CONTRATISTA SIN PARTICIPACIÓN ALGUNA DE LOS DUEÑOS.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DAR POR ADMITIDOS PRÁCTICAMENTE TODOS LOS HECHOS PROPUESTOS POR LA PARTE APELADA EN SU SOLICITUD DE SENTENCIA SUMARIA PARCIAL, A PESAR DE HABER SIDO CONTROVERTIDOS CONFORME DISPUESTO POR LA REGLA 36.3(B) DE LAS REGLAS DE PROCEDIMIENTO CIVIL, TOMANDO TAL CUAL UN PROYECTO DE SENTENCIA DEL APELADO Y POR OTRA PARTE NO DAR POR ADMITIDOS NINGUNO DE LOS HECHOS PROPUESTOS POR LA APELANTE EN SU MOCIÓN EN OPOSICIÓN Y SOLICITUD DE SENTENCIA SUMARIA, PRESENTADOS CONFORME REQUIERE LA REGLA 36.3(a)(4) SUSTENTADOS EN DECLARACIONES JURADAS, PRUEBA ADMISIBLE Y SIN QUE LA OPOSICIÓN POR LA PARTE APELADA CUMPLIERA CON LOS REQUISITOS DE LA REGLA 35.3(C) Y LA REGLA 36.3(d).

## II.

### A.

### Moción de Sentencia Sumaria

Nuestro ordenamiento procesal civil reconoce el uso y valor que tiene la sentencia sumaria para asegurar una solución justa, rápida y económica de los casos. La herramienta procesal de la sentencia sumaria posibilita la pronta resolución de una controversia, cuando no es necesario celebrar un juicio en su fondo. No obstante, para que proceda es necesario que, de los documentos no controvertidos, surja que no hay controversia real y sustancial sobre los hechos materiales del caso. Un hecho material es aquel que puede afectar el resultado de la reclamación, de acuerdo con el derecho sustantivo aplicable. La controversia sobre los hechos

materiales tiene que ser real. Cualquier duda es insuficiente para derrotar una moción de sentencia sumaria. La sentencia sumaria procede cuando no existe controversia de hechos materiales y únicamente resta aplicar el derecho. *Cruz, López v. Casa Bella y otros,* 2024 TSPR 47, 213 DPR ___ (2024); *Universal Ins. y otro v. ELA y otros,* 211 DPR 455, 471-472 (2023).

La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, exige el cumplimiento de ciertos requisitos de forma para instar una moción de sentencia sumaria y su respectiva oposición. La parte que sostenga la inexistencia de una controversia sustancial de hechos esenciales y pertinentes debe presentar una moción que se funde en declaraciones juradas u otra evidencia admisible. Además, tanto la moción como la oposición deberán cumplir con lo establecido en la Regla 36.3, *supra.* La sentencia sumaria no puede dictarse cuando: (1) existen hechos esenciales controvertidos, (2) la demanda tiene alegaciones afirmativas que no han sido refutadas, (3) existe una controversia real sobre algún hecho esencial o material que surge de los propios documentos que acompañan la moción o (4) no procede como cuestión de derecho. *Universal Ins. y otro v. ELA y otros,* supra, pág. 472.

El Tribunal de Apelaciones se encuentra en la misma posición que el Tribunal de Primera Instancia al momento de revisar las solicitudes de sentencia sumaria. Al igual que el TPI tiene que regirse por la Regla 36, *supra*, y aplicar los criterios que esa regla y su jurisprudencia interpretativa exigen. Ambos foros tienen que revisar que la moción de sentencia sumaria y su oposición cumplan los requisitos de forma codificados en la Regla 36, *supra.* El Tribunal de Apelaciones no podrá considerar evidencia que las partes no presentaron en el Tribunal de Primera Instancia. Este foro tampoco podrá adjudicar los hechos materiales en controversia, porque esa es una tarea que el Tribunal de Primera Instancia tiene que hacer,

luego de realizar un juicio en su fondo. La revisión que hace el Tribunal de Apelaciones es la de un juicio de novo. El foro apelativo debe examinar el expediente de la manera más favorable para la parte opositora a la moción de sentencia sumaria y hacer todas las inferencias permisibles a su favor. *Cruz, López v. Casa Bella y otros,* supra; *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 118 (2015).

Al revisar una sentencia sumaria, el Tribunal de Apelaciones tiene que evaluar si realmente existen hechos materiales en controversia. Cuando determina que existen hechos materiales en controversia debe exponer cuáles son. Además, tiene que determinar cuáles están incontrovertidos. Si encuentra que todos los hechos materiales están realmente incontrovertidos, procede que revise de novo, si el TPI aplicó correctamente el derecho. *Meléndez González et al. v. M. Cuebas,* supra, pág. 119.

**B.**

**Doctrina General de los Contratos**

Según lo establecido en el Art. 1044 del Código Civil de 1930, vigente a la fecha de los hechos, 31 LPRA sec. 2994, las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse a tenor de estos.[2] El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras a dar alguna cosa o prestar algún servicio. Art. 1206 del Código Civil, 31 LPRA sec. 3371. Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, la moral, ni al orden público. Art. 1207, 31 LPRA sec. 3372. La validez y el cumplimiento de los contratos no puede dejarse al arbitrio de uno de los contratantes. Art. 1208, 31 LPRA sec. 3373. Cuando los

---

[2] El Código Civil de 2020 establece que sus disposiciones no serán aplicables a los contratos en curso de ejecución vigentes al momento de su vigencia. Art.1813, 31 LPRA sec. 11718.

términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Art. 1233, 31 LPRA sec. 3471. No obstante, en ocasiones la voluntad de las partes no puede determinarse con la mera lectura de las cláusulas contractuales. Cuando esa es la situación, será necesario juzgar la intención de los contratantes a la luz de los actos anteriores, coetáneos y posteriores al contrato, así como las circunstancias indicativas de la voluntad de las partes. *Cruz, López v. Casa Bella y otros,* supra. Los contratantes que incurren en negligencia, dolo o morosidad en el cumplimiento de sus obligaciones están sujetos a indemnizar por los daños causados. Art. 1054, 31 LPRA sec. 3018.

El contrato de préstamo es un contrato de adhesión, en el que las condiciones de su reglamentación son obra de una sola de las partes. El otro contrayente no presta colaboración alguna en la formación del contenido contractual. Aunque los contratos de adhesión son válidos, deben interpretarse de la forma más favorable para la parte que no tuvo nada que ver en su redacción. No obstante, eso no significa que la interpretación sea irrazonable. *Coop. Sabaneña v. Casiano Rivera,* 184 DPR 169, 176-177 (2011).

### C.

### *Cruz, López v. Casa Bella y otros,* supra

Hechos

La parte demandante suscribió un contrato de construcción con Casa Bella Corp. Posteriormente, otorgaron un segundo contrato de construcción en el que incluyeron una cláusula de relevo de responsabilidad. La demandante suscribió un contrato de préstamo con COOPACA para financiar la construcción. Aunque la institución financiera no fue parte del contrato de construcción, dicho contrato incluyó una cláusula sobre cómo debía desembolsar los fondos del préstamo. No obstante, en el contrato de préstamo

suscrito entre los demandantes y COOPACA también se estableció la forma en la que la institución financiera realizaría los desembolsos. Según lo pactado, COOPACA tenía que hacer los desembolsos en la cuenta de los demandantes. No obstante, para hacer los desembolsos tenía que contar con la **previa solicitud por escrito de los demandantes.**

Los demandantes presentaron una demanda por vicios ocultos e incumplimiento de contrato contra el constructor y la institución financiera que financió la obra. La causa de acción contra COOPACA está basada en su alegado incumplimiento del contrato de préstamo. Los demandantes responsabilizaron a COOPACA de realizar pagos sin su autorización, sin que las etapas estuvieran terminadas, a base de certificaciones indebidas del ingeniero y a pesar de que la construcción era una ruina. La institución bancaria alegó como defensa, que expidió los cheques a nombre de los demandantes y del constructor, para que no fuera posible negociarlos sin el endoso de ambos.

COOPACA pidió la desestimación sumaria de la reclamación en su contra. El TPI dictó sentencia sumaria a su favor. El Tribunal de Apelaciones revocó al TPI, porque concluyó que la institución financiera incumplió con las obligaciones del contrato de préstamo. El foro apelativo ordenó al TPI realizar una vista evidenciaria, para determinar la procedencia de los presuntos daños que alegaba la demandante. La institución financiera acudió al Tribunal Supremo de Puerto Rico que redujo las controversias a determinar:

(1) Si el contrato de construcción y relevo de responsabilidad suscrito entre el contratista y el dueño de la obra es vinculante para la institución que se limitó a financiar la obra.

(2) Si la institución financiera incumplió con el contrato de préstamo que formalizó con el dueño de la obra, porque desembolsó fondos de la forma establecida en el contrato de construcción del que no fue parte.

El Tribunal Supremo de Puerto Rico resolvió que la relación contractual entre los demandantes y la institución financiera se rige por el contrato de préstamo. Según el tribunal, la Cooperativa incumplió sus obligaciones, porque desembolsó fondos, sin contar la solicitud escrita de los recurridos como acordaron en el contrato de préstamo. El tribunal resolvió que la institución no podía alegar como defensa que expidió los cheques a nombre del demandante y de la constructora, como es el uso y costumbre. Nuestro más Alto Foro judicial local concluyó que esa defensa no prospera, porque el contrato de préstamo es la ley entre las partes y COOPACA estaba sujeta a su cumplimiento. El Tribunal Supremo de Puerto Rico dio relevancia a que la institución financiera posee conocimiento especializado sobre las obligaciones contractuales que asume y las repercusiones que conlleva el incumplimiento de los términos pactados. No obstante, hizo hincapié en que su responsabilidad se limita a los daños ocasionados por el incumplimiento de los acuerdos del contrato de préstamo. Igualmente advirtió que la demandante deberá probar los daños alegados y que la institución financiera no responde por los vicios ocultos.

Decisión

El caso fue devuelto al TPI para que realizara una vista evidenciaria y que conforme a la prueba presentada determinara si la institución financiera ocasionó los daños que alegó la demandante por su incumplimiento del contrato de préstamo. El Tribunal Supremo ordenó al foro primario considerar la actitud pasiva de los demandantes, que no notificaron al banco los problemas de construcción y no indagaron si pagó la segunda y tercera etapa, a pesar de que conocían que la obra continuaba en curso.

**III**

Los errores señalados se reducen a determinar, si no existe controversia de hechos esenciales que impida adjudicar

sumariamente la reclamación contra PMC y Eliezer Reyes y si la sentencia sumaria procede conforme a derecho. Ambas partes están de acuerdo en que no existe controversia de hechos esenciales. La parte apelante, en síntesis, alega que Preferred Mortgage: (1) hizo desembolsos sin que el dueño aprobara por escrito las certificaciones y facturas del contratista, contrario a lo pactado y resuelto en *Cruz, López v. Casa Bella y otros,* supra, y a las exigencias establecidas para los préstamos de construcción financiados por el Departamento de Veteranos; (2) cambió unilateralmente las condiciones y la naturaleza del préstamo, porque pagó por adelantado al contratista los gastos del permiso de construcción y de los materiales, sin la acreditación de las partidas reclamadas; (3) pagó por el permiso de construcción una cantidad distinta a la establecida en el propio permiso y (4) pagó al contratista los gastos facturados por el Inspector de Obra, a pesar de que determinó que el inspector de obra es una figura independiente.

La apelada sostiene que cumplió todas las obligaciones que asumió en el contrato de préstamo y alega que la apelante endosó los cheques con los que pagó al contratista.

Este tribunal hizo un juicio de novo de la totalidad del expediente que el TPI tuvo ante su consideración. Una evaluación minuciosa de la prueba nos convence de que no existe controversia de hechos esenciales que impida la adjudicación sumaria de la reclamación contra PMC y Eliezer Reyes. Sin embargo, el derecho no está a favor de la entidad financiera. El foro apelado se equivocó al desestimar sumariamente la reclamación contra PMC, porque su incumplimiento con el contrato de préstamo quedó evidenciado.

Ambas partes reconocen que firmaron un documento titulado, Requisitos Generales-Préstamo con Reparaciones. La apelada alega que en ese acuerdo los apelantes: (1) eximieron expresamente a PMC de responsabilidad por las garantías de la construcción y de las

mejoras, (2) acordaron reclamar directamente al contratista y (3) aceptaron que los cheques iban a ser pagados a nombre del cliente y el contratista. Es evidente la existencia de los acuerdos señalados por la entidad financiera, ya que están textualmente en los Requisitos Generales-Préstamo con Reparaciones. No obstante, no son suficientes para exonerarla de responsabilidad. La entidad financiera omite otros acuerdos que también fueron establecidos en ese documento. **Las partes acordaron expresamente que el cliente tenía que entregar una carta certificando que estaba de acuerdo con todas las reparaciones realizadas, como condición para recibir los cheques de reembolso. Igualmente, omite los acuerdos de no realizar adelantos y de que el cliente debía tener el dinero para realizar las mejoras.** Véase, pág. 224 del apéndice del recurso.

La entidad financiera sostiene que los adelantos de desembolsos son una práctica típica para justificar los pagos por adelantado para el permiso de construcción y la compra de materiales. Sus argumentos quedan derrotados por los acuerdos expresamente suscritos en el contrato de préstamo. Las partes acordaron expresamente que los pagos se realizarían solo mediante reembolso y que el cliente debía tener el dinero para realizar las mejoras indicadas en la tasación. Véase, pág. 224 del apéndice del recurso. El incumplimiento de la apelada es un hecho probado. La señora Nery Magaly González Rivera aceptó que se realizaron pagos por adelantado y sin la solicitud ni aceptación escrita del cliente, contrario a lo pactado. Véase, págs. 628-629 del apéndice. Por su parte, la apelante hizo constar en una declaración jurada que: (1) el día del cierre se les informó la emisión de un primer cheque para el contratista de $30,725 para la compra de materiales y otro de $6,566 para los permisos de construcción, (2) supo el concepto de cada cheque después que reclamó el expediente del préstamo,

cuando el contratista abandonó la obra, (3) nunca recibió orientación ni se le requirió aprobación sobre esos adelantos, (4) solo recibió instrucciones de que estaban los dos cheques y que tenía que entregarlos al contratista, (5) nunca pidió tales adelantos, (6) le extrañó que se dieran adelantos, porque siempre se enfatizó que los pagos serían mediante reembolso, y (7) desconoce quién es el ingeniero Burgos. Véase, pág. 838 del apéndice.

PMC intenta ser exonerada de responsabilidad porque la apelante firmó los cheques con los que pagó al contratista. La apelada pretende que resolvamos contrario a los pactado. PMC olvida que se obligó a no hacer desembolsos, sin una carta en la que el cliente certificara su acuerdo con todas las reparaciones. El expediente está huérfano de esas certificaciones en las que los apelantes expresaran por escrito su satisfacción con la obra. Tampoco podemos pasar por alto, que el prestamista tiene que obtener la aprobación escrita del prestatario antes de realizar los pagos al contratista de la obra, cuando el préstamo es garantizado por la Administración de Veteranos. Aquí es un hecho que los apelantes no autorizaron por escrito los desembolsos, como se estableció en el contrato de préstamo.

Los testimonios del apelado, la señora Nery González y la apelante nos convencen de que los apelantes no participaban en el proceso de corroborar si el contratista realizó la obra y si procedía pagar las facturas. Su participación se circunscribió a firmar los cheques. No podemos pasar por alto que el contrato de préstamo es de adhesión y que la apelante declaró bajo juramento que se limitaba a seguir las instrucciones de PMC. Igualmente, no podemos obviar el expertise que tiene la entidad financiera sobre los contratos de préstamos, de las obligaciones que asume y las consecuencias del incumplimiento.

Por otro lado, aunque es un hecho que los apelantes contrataron a Floor Plan Corp., el documento firmado no cumple con las formalidades de un contrato de construcción realizado por etapas. El documento realmente es una propuesta de servicios y no se identifican con especificidad las distintas etapas, el costo detallado de cada una de las obras a realizar y de los materiales a utilizar. PMC otorgó el préstamo e hizo los desembolsos a base de ese escueto documento. Véase, pág. 59 del apéndice. Otro hecho relevante es que el contratista presentó a la apelada un permiso de construcción para una obra por una cantidad menor y distinta a la que se pactó y otorgó el préstamo. Véase, pág. 633 Deposición señora González. Aun así, la apelada pagó por adelantado los costos del permiso.

Ambas partes están de acuerdo en que, los vendedores y los compradores otorgaron por escrito un Acuerdo de Realizar Reparaciones Requeridas por Reglamentación y Política de la Agencia Correspondiente. **No obstante, ese documento les fue provisto por la institución financiera.** Las partes asintieron a que PMC retuviera $124,936.00 para asegurar las reparaciones que necesitaba la propiedad y se comprometieron solidariamente que se hicieran de manera satisfactoria dentro de no más de 90 días. Ambas autorizaron a PMC a utilizar los fondos retenidos para realizar las reparaciones correspondientes, en caso de que los suscribientes incumplieran con dicho término y sin tener que notificarles previamente. La entidad financiera también tenía entera discreción para utilizar esos fondos para pagar cualquier mensualidad del préstamo y mantener la cuenta al día. Los suscribientes autorizaron a PMC a presentarse en la propiedad para realizar las reparaciones requeridas. Véase, pág. 736 del apéndice.

La apelada no hizo uso de esa cláusula, a pesar de que forma parte del documento que proveyó a los contratantes. La apelante

declaró bajo juramento que, para el mes de octubre de 2018, la apelada ya tenía conocimiento de su descontento con la obra, debido a la falta de progreso. No obstante, PMC insistió en mantener el contratista. Véase, pág. 840 del apéndice. La señora González admitió que PMC no tiene ningún protocolo para atender las situaciones en las que el contratista ha excedido el término para terminar la obra en este tipo de préstamo. Véase, pág. 816 del apéndice. Igualmente reconoció que se enteró de los problemas en las reparaciones en el mes de octubre de 2019, dentro del término de 90 días. Véase, pág. 821 del apéndice.

La entidad financiera sostiene que Eliezer Reyes Castro inspeccionaba la obra solo para verificar si los desembolsos solicitados estaban fundados en lo que se podía percibir ocularmente. PMC argumenta que advirtió al cliente en múltiples ocasiones que era responsable de contratar un inspector de obras, para que evaluara el alcance y la calidad de los materiales y los trabajos. El apelante otorgó un contrato de Designación, Aceptación de Supervisor o Inspector de Obras con el ingeniero Guillermo Burgos Maldonado, como un requisito indispensable para la expedición del permiso de construcción conforme a la Ley de Certificaciones. Véase, pág. 618 del apéndice. No obstante, en el expediente existe evidencia de que el contratista reclamó el pago de los servicios de Project Manager. Nos referimos a las facturas que presentó el contratista y que PMC pagó. Véase, pág. 741 del apéndice. El señor Eliezer Reyes Castro admitió que PMC realizó el pago. Véase, págs. 781 y 822-825 del apéndice. La señora González hizo la misma admisión. Véase, pág. 823 del apéndice.

Conforme a la prueba que hemos visto, el desembolso de los fondos dependía de que el señor Reyes diera su visto bueno. El propio apelado admitió que no vio ningún documento en el que los apelantes autorizaran los desembolsos. Véase, pág. 777 del

apéndice. Reyes reconoció que inspeccionó la propiedad solo porque, en ocasiones, ni siquiera estaba el contratista. Véase, págs. 779-780 del apéndice. Igualmente aceptó que no tenía evidencia de que notificó a las partes de sus visitas a la propiedad. Véase, pág. 779 del apéndice. Los Memo Files, preparados por el apelado, tampoco contienen constancia de la participación de los apelantes en la inspección ni de su aprobación. Véase, pág. 254 del apéndice. La apelante declaró que la persona que supervisaba la obra era el apelado. Véase, págs. 443-444 del apéndice. Según consta en la propia moción de sentencia sumaria, la apelada preparaba el cheque una vez recibía el informe del señor Reyes.

El incumplimiento de la apelada con los acuerdos suscritos en el contrato de préstamo está probado. La entidad financiera hizo pagos por adelantados y sin el consentimiento escrito de los apelantes en violación a lo pactado. La apelada sostiene que preparaba los cheques a nombre del contratista y de los clientes para controlar que ninguno utilizara los fondos para otros propósitos y para que fueran aceptados, firmados y endosados por ambos. El Tribunal Supremo de Puerto Rico ya resolvió esa controversia en *Cruz, López v. Casa Bella y otros,* supra. La apelada incumplió sus obligaciones, porque desembolsó fondos, sin contar con la certificación escrita de los apelantes como acordaron en el contrato de préstamo. La institución financiera no puede alegar como defensa que expidió los cheques a nombre de los apelantes y de la constructora, como es el uso y costumbre. El Tribunal Supremo concluyó que esa defensa no prospera, porque el contrato de préstamo es la ley entre las partes y la apelada estaba sujeta a su cumplimiento. La institución financiera responde por los daños contractuales que los apelantes prueben que sufrieron por su incumplimiento con el contrato de préstamo. Tal como se resolvió en *Cruz, López v. Casa Bella y otros,* supra, devolvemos el caso al

TPI para que realice una vista evidenciaria en la que la apelante presente prueba para demostrar que el incumplimiento de la institución financiera con el contrato de préstamo le ocasionó los daños alegados en su contra y de haberlos se valoren los mismos, ello en proporción a la actitud pasiva asumida respecto al trámite de los desembolsos y la falta de notificación a la institución financiera respecto a la evolución y progreso de la obra de construcción.

**IV**

Por los fundamentos antes expuestos, se revoca la sentencia apelada y se devuelve el caso al TPI para que cumpla lo aquí ordenado.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones